Matthew J. LANNIE, Appellant,

v.

Donna E. SHALALA, Secretary of Health and Human Services of the United States, Appellee.

No. 94–2957.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1995.

Decided March 31, 1995.

Lewis Alfred Huddle, Jr., Little Rock, AR, argued, for appellant.

Joyce Shatteen, HHS, of Dallas, TX, argued, for appellee.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In September, 1988, Matthew Lannie was in a car accident. About a year and a half later, he applied for federal disability benefits, citing emphysema, high blood pressure, arthritis, and problems with his neck, shoulders, and back that were exacerbated by the accident. *See* 42 U.S.C. § 423(a)(1). After a hearing, an administrative law judge denied Mr. Lannie's claim in late 1990. *See* 42 U.S.C. § 405(b).

On reconsideration, the Appeals Council of the Social Security Administration vacated that denial and remanded Mr. Lannie's case to the administrative law judge for a new decision. *See* 20 C.F.R. § 404.977. The basis for the remand was the administrative law judge's failure to obtain adequate testimony with respect to whether a significant number of jobs existed in the national economy that Mr. Lannie could perform, taking into account his chronic lung disease (which precluded exposure to excessive dust and fumes) and his restriction to sedentary or light work. *See* 20 C.F.R. § 404.1520(f)(1).

After an additional hearing, the administrative law judge in mid–1992 again denied Mr. Lannie's claim. *See* 42 U.S.C. § 405(b). After denial of reconsideration by the Appeals Council, Mr. Lannie sued in federal court in late 1992 for judicial review. *See* 42 U.S.C. § 405(g). On cross-motions for summary judgment before a magistrate judge acting by consent of the parties, *see* 28 U.S.C. § 636(c)(1), § 636(c)(3), and Fed. R.Civ.P. 73(a), 73(c), the magistrate judge affirmed, in mid–1994, the decision of the administrative law judge.

Mr. Lannie appeals, arguing that the administrative law judge's decision to deny disability benefits is not supported by substantial evidence "on the record as a whole," *Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir. 1991), *see also* 42 U.S.C. § 405(g). In particular, Mr. Lannie contends that the administrative law judge considered the medical evidence only selectively and ignored both Mr. Lannie's complaints of pain and the medical evidence that corroborates those complaints. We reverse and remand for an order consistent with this opinion.

## I.

Mr. Lannie's medical records in this case go back only to the day of the car accident in September, 1988. He was evaluated on that day in a hospital emergency room, where he complained of head, neck, and chest pain, and was released with a prescription for pain medication. At that time, a chest X-ray showed signs of chronic obstructive pulmonary disease. The hospital records also reflect that Mr. Lannie had high blood pressure. On the following day, he returned to the hospital and was admitted, primarily for treatment of his high blood pressure; the hospital records also reflect, however, a "chronic cough," "decreased breath sounds," and lung disease. Mr. Lannie was discharged from the hospital a day later, with two prescriptions for medication to treat his high blood pressure.

Mr. Lannie went to his family doctor three days after the car accident, complaining of headache, lower back pain, and shooting pains up his spine to the base of his neck. The doctor's notes show diagnoses of neck strain, lower back strain, and soft-tissue trauma. The doctor prescribed an anti-inflammatory medication. A week later, Mr. Lannie was still complaining of headache and pain in his back. The doctor prescribed physical therapy and renewed the prescription for Mr. Lannie's pain medication.

Three days later, Mr. Lannie returned to his doctor with "[b]itter complaints" of pain and headache. The doctor prescribed a stronger pain medication. A week later, the doctor saw Mr. Lannie a fourth time and again diagnosed Mr. Lannie as having post-traumatic headache and neck strain.

A month after the accident, the doctor's notes reflect that Mr. Lannie reported his condition as "about the same." Mr. Lannie also stated that his neck was "still tight" and that physical therapy did not help it. The doctor sent Mr. Lannie for a CT scan of his

neck. The CT scan showed "a myriad of degenerative changes" at "multiple levels" in Mr. Lannie's neck. The radiologist interpreting the CT scan suspected a partial herniated disk associated with "chronic arthritic changes in the spine."

Mr. Lannie began seeing a neurologist about seven weeks after the car accident, apparently at the suggestion of his family doctor. The neurologist's initial diagnosis was disease of the nerve roots in the neck (cervical radiculopathy). The neurologist arranged for Mr. Lannie's admission to a hospital for further tests. Various tests at the hospital showed "moderate" narrowing of the nerve passages into Mr. Lannie's neck associated with osteoarthritic changes, some bulging of the disks in his neck, some decrease in motor function of the right arm and hand, some loss of sensory function in his left arm, lung disease, high blood pressure, and a healing rib fracture. At the time of Mr. Lannie's discharge from the hospital, the neurologist diagnosed him as having emphysema and disease of the nerve roots in the neck.

A week later, Mr. Lannie went to a rehabilitation center, apparently at the suggestion of either his family doctor or the neurologist, for an assessment of work capability. The physical therapist who evaluated Mr. Lannie stated that Mr. Lannie "appeared to give a valid effort with testing." The physical therapist summarized Mr. Lannie's test results as indicating that he was "doing fairly well functionally but may have difficulty performing his regular job duties for an eight-hour day." The following week, Mr. Lannie returned to the neurologist, who prescribed physical therapy, heat, massage, and motor strengthening exercises. Mr. Lannie received two weeks of physical therapy (three visits per week).

In December, 1988, about three months after the car accident, Mr. Lannie saw the neurologist again. At that time, the neurologist noted that Mr. Lannie had full range of motion in his neck but still suffered from tenderness on the left side, muscle spasms in his back, decreased motor function in his arms, and reduced sensory function in his left arm; he also had high blood pressure.

The neurologist prescribed a muscle relaxant and a strong pain reliever and renewed Mr. Lannie's prescription for blood pressure medication. In his notes, the neurologist remarked that Mr. Lannie "may require surgery later." The diagnosis of disease of the nerve roots remained unchanged.

About a month later, Mr. Lannie went to an orthopedic clinic, probably for a second opinion regarding surgery. The doctor at that clinic felt that Mr. Lannie "has chronic osteoarthritis in the cervical spine [neck] aggravated by the automobile accident." That doctor did not believe that Mr. Lannie would benefit from surgery at that time. With respect to Mr. Lannie's ability to work, that doctor felt that Mr. Lannie could drive and could carry a clipboard. That doctor cautioned, however, that Mr. Lannie should not be doing "any heavy lifting" or anything requiring his neck to be placed "in a position of extreme flexion or extension for any long length of time."

Three days after his visit to the orthopedic clinic, Mr. Lannie returned to the neurologist. At that time, Mr. Lannie had decreased range of motion in his neck and decreased motor and sensory functions in his left arm. On a visit for rechecking a month later, Mr. Lannie's difficulties were the same. The neurologist then sent him to a neuromuscular laboratory for additional tests. The doctor at that laboratory noted an "unusual ... configuration" of one of the nerves in Mr. Lannie's left arm. Mr. Lannie returned to the neurologist, who arranged for an MRI of Mr. Lannie's neck. The MRI showed "mild degenerative discal changes" and some disk bulging in Mr. Lannie's neck.

In spring, 1989, about seven and a half months after the car accident, Mr. Lannie's condition was the same. The neurologist summarized Mr. Lannie's condition at that time as including "decreased range of motion," "[m]uscle spasms and tenderness" in the neck, and "decreased motor functions ... and decreased sensory functions ... on the left side." The neurologist diagnosed Mr. Lannie's condition as disease of the nerve roots on the left side of his neck and remarked that Mr. Lannie had "reached his period of maximum healing." The neurolo-

gist stated that Mr. Lannie was "limited in the amount of work that he can perform" but that he could "stand and move about for approximately 45 minutes to an hour." Mr. Lannie's lifting and carrying abilities, according to the neurologist, were about 40 pounds.

In mid–1989, Mr. Lannie took a series of lung function tests. Those tests suggested "[m]ild obstructive [lung] disease."

In late 1989, Mr. Lannie was hospitalized for 11 days with pneumonia. Doctors' notes for that period reflect that Mr. Lannie had high blood pressure, chronic obstructive pulmonary disease, decreased oxygen in the blood, anemia (probably related to gastrointestinal bleeding), and liver disease (possibly related to heavy drinking). On discharge from the hospital, Mr. Lannie was given a prescription for medication to decrease the acid in his gastrointestinal system.

In spring, 1990, Mr. Lannie saw a consulting doctor for purposes of disability determination. That doctor found that Mr. Lannie had high blood pressure and reduced range of motion in his neck.

In late 1991, Mr. Lannie's family doctor related in a letter that he had been treating Mr. Lannie since 1987 for "arthritis, emphysema and a ruptured [neck] disc." That doctor remarked, "His conditions will not improve. They are progressively becoming worse." In addition, that doctor stated, Mr. Lannie had "a depression and bronchitis which are resistant to treatment and stable."

Mr. Lannie went for a psychological evaluation in early 1992, probably at the request of the administrative law judge. The psychologist gave him several tests, most of which yielded normal results (organic screening, cognitive abilities); the psychologist noted, however, that the personality evaluation profile was "of doubtful validity." In a written evaluation of Mr. Lannie, the psychologist seems to suggest that Mr. Lannie was trying to portray himself as "very pathological." After seeing that written evaluation, Mr. Lannie's family doctor questioned the psychologist's conclusions. The doctor stated that the psychologist's implication that Mr. Lannie was "acting like a malingerer" was "contrary to my observation of [Mr.

Lannie] over the last two years." The doctor's opinion was that Mr. Lannie "tend[ed] [instead] to minimize his complaints." Mr. Lannie's family doctor suggested a second psychological evaluation in view of the discrepancy between his impressions and those of the psychologist.

## II.

There is a "five-step sequential evaluation process for determining whether a person is disabled.... [If the claimant is not currently engaged in substantial gainful activity], the decisionmaker ... determines whether the claimant has a medically severe impairment or combination of impairments.... [If the claimant has a severe impairment], the evaluation ... determines whether the impairment is equivalent to one of a number of listed impairments that [are considered as a matter of law to be] so severe as to preclude substantial gainful activity.... If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to ... determine[] whether the impairment prevents the claimant from performing work he has performed in the past.... If the claimant cannot perform this work, the ... final step of the process determines whether he is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work." *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); *see also* 20 C.F.R. § 404.1520(a), § 404.1520(c), § 404.1520(d), § 404.1520(e), § 404.1520(f)(1). The parties seem to agree that Mr. Lannie cannot perform his past work and that the critical question in this case is whether other jobs exist in the national economy that he can perform.

Mr. Lannie's medical records reflect that between September, 1988 (the time of the car accident), and May, 1989 (when the neurologist stated that Mr. Lannie had "reached his period of maximum healing"), Mr. Lannie regularly sought medical attention for pain in his neck. Nearly all of the doctors' records reflect problems with range of motion, decreased motor and sensory function in Mr.

Lannie's left arm, high blood pressure, and lung disease. Nearly all of the test results indicate some compromise of lung function, high blood pressure, and degenerative arthritic changes affecting Mr. Lannie's neck. Mr. Lannie's family doctor does not expect any of those conditions to improve. As of late 1991, Mr. Lannie reported that he was regularly taking prescription medications for lung disease, high blood pressure, pain, gastrointestinal acid reduction, and depression (that report is substantiated by doctors' records).

With respect to his neck problems, Mr. Lannie testified that he can sit but that his neck "tighten[s] up" after 30 to 45 minutes, that he takes pain medication four or five days a week, that he has pain every night because of changes in position while he is sleeping, and that he cannot turn his neck more than 45 degrees without pain. With respect to his lung problems, Mr. Lannie testified that he has been diagnosed with emphysema since 1974, that it takes him "about two hours to get [his] chest cleared" in the mornings, that he is "real short of breath" and "completely winded" after minimal exercise, and that in dusty or humid environments he starts coughing.

In spite of all of those circumstances, the administrative law judge found in his decision that Mr. Lannie had "adequate movement," full use of his arms, "adequate mobility," and "no evidence of any neurological problems" with respect to his neck and that his breathing problems were not so severe as to preclude his doing "a wide range of sedentary to light work," including the jobs of motor vehicle or maintenance dispatcher, maintenance scheduler, and cashier. The administrative law judge specifically stated, in fact, that Mr. Lannie's lung disease was amenable to treatment, even though Mr. Lannie's family doctor stated that it was "progressively becoming worse" and would not improve.

The administrative law judge made no mention of Mr. Lannie's high blood pressure, the multiple prescription medications that he is taking, or whether Mr. Lannie could endure an eight-hour workday. Indeed, neither the administrative law judge nor the vocational expert addressed the problem of an eight-hour workday, even though all of the jobs identified as possibilities by the vocational expert involved sedentary work and Mr. Lannie testified that "there's no way" that he could sit at a desk for eight hours.

The administrative law judge made a specific reference to the psychologist's suggestion that Mr. Lannie "may be trying to exaggerate his problems" but made no reference to the statements of the family doctor whom Mr. Lannie had been seeing—at the time of the second hearing, for more than four years—that the psychologist's impressions from one instance were contrary to his own impressions from several years of experience with Mr. Lannie. Finally, despite the administrative law judge's own comment at the second hearing that he found Mr. Lannie to be "credible ... and ... very candid," the administrative law judge stated in his decision that Mr. Lannie was "not ... fully credible."

All of these discrepancies, in addition to our careful consideration of the record submitted to us, lead us to the conclusion that the administrative law judge's determination is not supported by substantial evidence "on the record as a whole," *Ghant v. Bowen,* 930 F.2d 633, 637 (8th Cir.1991), *see also* 42 U.S.C. § 405(g). For that reason, we reverse the magistrate judge and remand this case with directions for the entry of an order granting federal disability benefits to Mr. Lannie.